HELEN ECKERT, Respondent, v. THE CITY OF NEW YORK, Appellant.

First Department, December 19, 1924.

Municipal corporations — action against city of New York to recover for injuries suffered when plaintiff fell on icy sidewalk — accident occurred about sixty-one hours after very severe rain, sleet and snow storm — evidence shows that city put forth extra efforts to remove snow and ice — city, as matter of law, was not guilty of negligence.

The city of New York, as a matter of law, was not guilty of negligence in failing to remove ice from the sidewalk on Broadway at One Hundred and Tenth street on which the plaintiff fell and broke her wrist, since it appears that the accident happened about sixty-one hours after the snow, sleet and rain storm of February 4 to 7, 1920; that said storm was one of the worst that the city had ever experienced; that following the storm the temperature was alternately above and below freezing; that the city used all available help including a part of its police force and members of the fire department and also volunteer workers in an endeavor to remove the snow and ice from the streets; and that the snow was frozen so solidly that it could only be removed by picking and breaking it up.

APPEAL by the defendant, The City of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 8th day of November, 1923, upon the verdict of a jury for $1,500, and also

from an order entered in said clerk's office on the same day denying the defendant's motion for a new trial made upon the minutes.

*George P. Nicholson, Corporation Counsel [Elliot S. Benedict of counsel; John F. O'Brien with him on the brief], for the appellant.*

*Robert X. Kuzmier, for the respondent.*

DOWLING, J.:

On the 9th day of February, 1920, just prior to eight-thirty P. M., the plaintiff fell on the icy sidewalk on Broadway in front of the building on southeast corner of Broadway and One Hundred and Tenth street, in the city of New York, and broke her wrist.

She was walking on Broadway, not in the center of the sidewalk, but looking into the shop windows, and when she reached the corner building saw that the sidewalk was icy. However, she did not see the spot where she slipped. The corner was brightly lighted so that it was possible to see where she was stepping.

The ice was three or four inches deep and she slipped hard. She testified that she could not say the sidewalk was covered entirely with ice, but only where she had been walking; she tried to get off that part and while so doing, fell. She was picked up by two persons and carried into a café on the corner, whence she was removed to a friend's house.

A witness called by plaintiff testified that the coating of ice was almost an inch thick; that the sidewalk in front of the adjoining picture house was clean, with no ice or snow on it. But the photograph in evidence shows that the picture house had in front a permanent canopy or awning, projecting over the sidewalk for part of its width, at the apparent height of the ceiling of the ground floor.

Weather Recorder James H. Scarr, called as a witness by plaintiff, testified that in the month of January, 1920, seven and eight-tenths inches of snow had fallen, which was a little below the average, and that between three and four o'clock in the morning of February fourth it began to snow and continued snowing, raining and sleeting until February seventh at seven-fifteen A. M., during which time the snowfall amounted to seventeen and one-half inches. Thereafter until the time of the accident the temperature was alternately below and above freezing, ranging from twenty-three to thirty-eight degrees. In fact every night it went below freezing and rose a few degrees above it during the daytime.

This was one of the worst storms New York had had in many years, if not the very worst. As a result everything was blocked with snow so that it was many days before the sidewalks were shoveled off; traffic was tied up in the streets and some of the trolleys did not begin to operate until along in March. The precipitation

was peculiar in that there was no run off of the rain which alternated with the snow. The witness stated: " The whole mass itself was very heavy and dense, and the cold weather following it; that is, there was sufficient freezing following it to freeze it hard, and made a mass that had to be picked up. Q. It could not be shoveled off the sidewalks? A. No, not without picking, breaking up."

He also testified that the condition was unusual; that in some of the busy thoroughfares the ice was simply tramped down into a mass and people walked over it in that condition for weeks; that in density and water equivalent it was worse than the great blizzard of March, 1888, and that the progress of snow removal was greatly hampered by lack of labor.

The street cleaning department employed all the emergency force it could gather besides its own men to remove the snow, devoting most of its attention at first to relieving the territory around the railroad terminals in order to facilitate the distribution of food. Conditions were so bad that the mayor issued a proclamation requesting all citizens who had trucks or men to help relieve the situation.

For the defendant, James Asip, acting general superintendent of the street cleaning department, testified that " in the neighborhood of twenty-five hundred police officers assisted the Street Cleaning Department, working with picks and shovels in the streets, removing the snow and opening the roadways; firemen from all parts of the city were employed. I think the American Legion had a force out; the boy scouts were employed in different places, different parts of the city, to relieve localities that were congested and in bad condition. We had the students from the colleges assisting, in addition to the paid force."

He further testified that it was the worst storm in his experience of twenty-four years in the department; and speaking of the accumulated snow and ice he said: " You could not shovel it. Nothing would make any impression on it, only a pick in the hand of a man. Then it broke off in small pieces so that the delay necessarily in covering a large area was great."

The café in front of which plaintiff fell was at the corner. Adjoining it on the south was a moving picture house with a canopy or awning projecting over the sidewalk for part of its width at the height of the ceiling of the ground floor. Occupying part of the sidewalk near the corner, and evidently extending for a short distance in front of the café, is a kiosk for entrance to, or exit from, the uptown subway. According to the testimony of a police officer the plaintiff fell at a point on the sidewalk opposite the south window of the café.

The snow and ice had been cleaned off in front of the picture house and had been mostly melted from the part of the sidewalk leading away from the subway kiosk by the tramping of people going in and coming out of it. Plaintiff was evidently trying to reach this part of the sidewalk when she fell.

All of the witnesses for the plaintiff except the plaintiff herself testified that the ice in the front of the café was smooth. The testimony as to its thickness varied from one to four inches. After the storm ended the porter in the café tried several times to clean the snow and ice off the sidewalk, but it was too big a job for one man; it was frozen too solidly to the sidewalk to be removed.

About ten or fifteen minutes before the accident the police officer on that post had asked the cashier of the café to put some sand or ashes on the sidewalk, but the waiter, who tried to get sand from a sand box on the corner, could not because of its frozen condition. The officer who took this action did so because he saw some boys and other people fall about that time, but the conditions before then did not appear to him to be so dangerous as to warrant any action until he notified the cashier.

I am of the opinion that as a matter of law, upon the undisputed facts in this case, the city of New York was not guilty of negligence, nor responsible to plaintiff for the damages she sustained by reason of her injuries. The testimony abundantly proves that the last storm preceding the accident was one of unparalleled severity in the city of New York, and left conditions in its wake which no reasonable effort of the city authorities could have remedied by the time the plaintiff fell upon the ice. Every available city employee appears to have been put at work, even from departments that had nothing whatever to do with cleaning the city streets, and they were helped by volunteer workers. Still the task took an exceptionally long time. The situation is much like that described in *Taylor* v. *City of Yonkers* (105 N. Y. 202), only it was worse in the present case. There the court said (at p. 206): " When the streets have been wholly or partially cleaned it often happens that a fall of rain or the melting of adjoining snow is suddenly followed by severe cold, which covers everything with a film or layer of ice and makes the walks slippery and dangerous. This frozen surface it is practically impossible to remove until a thaw comes which remedies the evil. The municipality is not negligent for awaiting that result. It may and should require householders, when the danger is great, to sprinkle upon the surface ashes or sand or the like, as a measure of prudence and precaution, but is not responsible for their omission. It is no more bound to put upon the ice, which it cannot reasonably remove, such foreign material than

to cover it with boards." (See, also, *Staley* v. *Mayor, etc., of New York*, 37 App. Div. 598.)

In *O'Connor* v. *Mayor, etc., of New York* (16 Daly, 58) it was said (at p. 61) that " * * * a municipal corporation is not chargeable with neglect in permitting its streets to be in a dangerous condition, in the absence of proof that there was reasonable time to render such streets safe; that the question whether or not there was such reasonable time [the facts being undisputed] is a question of law to be determined by the court; that the uncontradicted facts in the present case, showing an interval of less than 48 hours between the cessation of the snowfall and the time of the accident, failed to show that defendant had a reasonable time within which to remove the accumulated ice and snow or otherwise to render the sidewalk in safe condition * * *.

" This view renders the question of notice of no importance in this case, for if it be conceded that defendant had actual notice of the dangerous accumulation of ice and snow on the sidewalk in question, defendant must nevertheless be held absolved from the imputation of negligence if there was no reasonable opportunity to remove the danger between the time of its first appearance and the happening of the accident."

While the storm, in the present case, terminated sixty-one hours before the accident, the conditions were so extraordinary as to warrant the enlargement of what was held to be reasonable delay of forty-eight hours in removing the snowfall, particularly as the storm was a general one throughout the city and brought about similar conditions in every part thereof.

In *Foley* v. *City of New York* (95 App. Div. 374) Mr. Justice McLaughlin said: " The obligation resting upon a municipal corporation to remove accumulations of snow and ice from its sidewalks is not an absolute but a qualified one. It is bound to keep the streets and sidewalks in a reasonably safe condition for public travel, and for the non-performance of that duty, in case of injury, it is responsible, but it is not bound to perform impossibilities or do unreasonable things. In a great city like New York, with its hundreds of miles of sidewalks, in a climate as changeable as it is there, it is not difficult to see that there are times when it is nearly if not quite impossible for it to keep its sidewalks entirely clear of snow and ice. In certain portions of the city, when a snowstorm occurs, the snow is quickly packed down by persons traveling upon the sidewalks, and if the temperature is below the freezing point, ice soon forms and adheres to the walk, which renders the process of removal not only difficult, but many times attended with no little delay. It cannot be said to be negligent, immediately follow-

ing a fall of snow, because it does not proceed at once to clear the sidewalks of snow and ice, because it is the duty of abutting property owners to do that work, and it has a right to rely for a reasonable time upon the assumption that they will perform the obligation which the law casts upon them. (*Crawford* v. *City of New York*, 68 App. Div. 107; S. C., affd., 174 N. Y. 518.) ''

*Williams* v. *City of New York* (214 N. Y. 259), relied upon by respondent, is clearly distinguishable from the present case. There, as the opinion shows (at p. 267): '' There was no snow over on the other side of St. Ann's avenue between One Hundred and Thirty-eighth and One Hundred and Thirty-ninth streets, opposite the icy sidewalk upon which the plaintiff fell. Sidewalks in the vicinity were all clean. This fact shows conclusively that a verdict for the plaintiff would not impose upon the city a measure of duty impossible of fulfillment. At all events, inasmuch as all the other sidewalks in the neighborhood had been cleared of snow and ice, the burden rested upon the city to prove that it was impossible to clean this one also, if such were the fact.''

The condition from which the plaintiff suffered was prevalent throughout the city, and was not confined to the sidewalk where she fell.

The judgment and order appealed from should, therefore, be reversed, with costs to appellant, and the complaint dismissed, with costs.

CLARKE, P. J., FINCH, McAVOY and MARTIN, JJ., concur.

Judgment and order reversed, with costs, and complaint dismissed, with costs.